**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

CORY BRYAN LEONE                          CIVIL ACTION NO. 16-1178

VERSUS                                    JUDGE S. MAURICE HICKS, JR.

JERRY GOODWIN, ET AL.                     MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court is Defendants Jerry Goodwin, Louisiana Department of Public Safety and Corrections, James M. LeBlanc, Chris Evans, Lonnie Nail, Scott Cottrell, and Mark Hunter's (collectively the "State Defendants") Motion for Summary Judgment (Record Document 34) pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss all of Plaintiff Cory Leone's ("Leone") claims. Leone opposed the motion. See Record Document 40. For the reasons which follow, the State Defendants' Motion is hereby **GRANTED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

On August 16 and 17, 2015, offender Ronnie Hongo ("Hongo") and Leone were housed on David Wade Correctional Center's ("DWCC") North Compound in the H3B dormitory. On August 16, Leone and Hongo got into a verbal dispute over a fan located in their dormitory, which was unwitnessed by corrections officials, where Leone called Hongo a homosexual. See Record Document 34-11 at 16-17. Hongo told another offender, Onge Washington ("Washington"), that he and Leone had had words. See Record Document 34-13. Washington stated that he "successfully diffused" the dispute, and that Hongo told him that everything was fine and the issue was settled. See id. No one informed corrections officials of the dispute that day.

1

On August 17 just after 9:00 a.m., Hongo assaulted Leone, who was asleep at the time, with two padlocks he secured to a belt. <u>See</u> Record Document 34-8 at 51. Pursuant to a review of the security video during the investigation, at 8:53 a.m., Hongo entered the dormitory and went to his bed where he removed the padlocks from his lockers and put his weapon together, hiding it from view. <u>See id</u>. at 43. At 8:58 a.m., a corrections officer got up from his desk to make a round in the dormitory, and stopped to speak to offender Morian Spivey ("Spivey"). <u>See id</u>. at 44. While the corrections officer was speaking to Spivey, Hongo approached Leone and began to strike him without warning just after 9:00 a.m. <u>See id</u>. at 50-51.

A corrections officer immediately ran over to restrain Hongo, with additional corrections officers responding to assist. <u>See id</u>. at 52-53. By 9:03 a.m., medical personnel had arrived at the scene and began life-saving response on Leone. <u>See id</u>. at 54. Leone was transported to the North Infirmary, where medical personnel continued to assess him, stabilize his condition, and called for transportation to University Health-Shreveport. <u>See</u> Record Document 34-10 at 44-46. A 911 call was made from DWCC to the Claiborne Parish Sheriff's Office at 9:08 a.m. requesting a trauma unit to the North Infirmary. <u>See id</u>. at 65. Prior to the assault, corrections officers were unaware of the verbal dispute of August 16, or that Hongo intended to harm Leone the following day. <u>See</u> Record Document 34-11 at 5-6. On August 27, Lt. Col. Scott Cottrell ("Cotrell") made an investigative report to Warden Jerry Goodwin ("Warden Goodwin"). <u>See</u> Record Document 34-10 at 50-56.

After treatment at University Hospital-Shreveport, Leone was returned to DWCC on August 28, and interviewed by Cottrell. <u>See id</u>. at 1. Cottrell then issued an addendum

to his investigative report. As a result of the investigation, Hongo received discipline for both the August 16 and 17 incidents, and was criminally charged for the August 17 attack on Leone. <u>See</u> Record Document 34-8 at 13-15. Leone and Washington also received discipline for their participation in the verbal argument with Hongo on August 16. <u>See id</u>.

On December 7, 2015, Leone submitted a request for protective custody claiming that DWCC had failed to protect him. <u>See</u> Record Document 34-10 at 2. Protective custody, a non-punitive housing option, is a form of separation from the general population for offenders requesting or requiring protection from other offenders for reasons of health and safety. <u>See id</u>. at 60-61. During the interview for protective custody, Leone told Warden Goodwin and Col. Chris Evans ("Evans") that he was concerned for his safety being housed in the same unit where he was previously attacked, and that he was following the advice of his attorney in seeking protective custody. <u>See id</u>. at 2.

On December 9, 2015, Leone was transferred from medium security to maximum security for protective custody in N4 on the South Compound. <u>See id</u>. There are three levels of protective custody. Protective Custody - Level 2 is the protection assignment which is usually made at an offender's request who has raised protection concerns, and it may be either short term or long term. Upon his arrival for Level 2-Protective Custody in N4, Col. Lonnie Nail ("Nail") explained to Leone that maximum security for protective custody carried limitations as to his visitation, phone and other privileges, and Leone appeared to understand. <u>See</u> Record Document 34-7 at 8-9. An offender placed in protective custody receives a review by a Classification Review Board every seven days for the first 60 days, and then every 30 days thereafter. <u>See id</u>. at 6. Nail sits on Classification Review Boards for the South Compound, and stated that from December

9, 2015, until the middle of April, 2017, Leone never made a request for a classification change, and Leone's classification remained the same. See id. at 4. In April of this year, Leone's classification was changed to a different level of protective custody, and he is now housed in N1A. See id.

Leone was seen by the medical staff prior to being placed in protective custody. See Record Document 34-10 at 43. During this examination, Leone denied any complaints or problems from his prior injuries. See id. Following the examination, Leone's routine medications were given to him by Security Staff, but there were times where he refused or did not request them. See id. at 3-10. While in protective custody, Leone continued to receive medical care. On January 5, 2016, the Mental Health Department conducted a follow up with Leone, where he voiced no mental health concerns, and no distress was noted. See id. at 49. On January 27, Leone was transported to University Health-Shreveport for a follow up medical examination with the Ophthalmology Clinic. See id. at 15. Dr. Pamela Hearn ("Dr. Hearn"), reviewed the medication recommendations by the Ophthalmology Clinic, and signed a physician's order for the medications recommended. See id.

On February 15, 2016, another mental health follow-up was made, and Leone voiced no mental health concerns, and no distress was noted. See id. at 48. On February 17, Dr. Hearn reviewed Leone's medical chart, and issued a physician's order to continue his seizure medication, Dilantin. See id. at 14.

On May 9, 2016, Leone was again seen by the Mental Health Department without having any mental health concerns. See id. at 47. On May 18, Leone was transferred to University Health-Shreveport for a follow-up Ophthalmology Clinic visit, and again Dr.

Hearn reviewed the medication recommendations by the Ophthalmology Clinic and entered a physician's order for the medications recommended. See id. at 26-33. In late June and early July of 2016, routine blood work showed that Leone's Dilantin levels had risen. See id. at 21. Dr. Jeffrey Fuller responded by holding doses of Phenytoin Dilantin, monitoring periodic blood work, and adjusting doses. See id. at 11-13.

Secretary James LeBlanc ("Secretary LeBlanc") and Warden Goodwin have extensive experience in supervisory and administrative positions in the area of corrections. See Record Document 34-4 and 34-5. The Louisiana Department of Public Safety and Corrections' ("LDPSC") practice of issuing padlocks to offenders to secure their personal belongings in lockers has been in place during the entire duration of both of their tenures with the LDPSC, and has not been changed. See id. While there is no specific written policy governing the issuance of padlocks, they are specifically listed as allowed property. See Record Document 34-5. Both Secretary LeBlanc and Warden Goodwin are aware that the practice of allowing offenders padlocks to secure their personal property is common in penal institutions throughout the United States, for both state and federal institutions, and that padlocks are sold in prison commissaries, including but not limited to, the Federal Bureau of Prisons at FCC Oakdale (Louisiana), FCC Pollock(Louisiana), FCI Waseca (Minnesota), FDC Houston (Texas), and FCI Tallahassee (Florida), as well as being on the items for purchase lists published by the state departments of corrections in Mississippi and Texas. See Record Document 34-4 and 34-5.

Both Secretary LeBlanc and Warden Goodwin know that the reason padlocks are issued to offenders as a means of securing their personal belongings is that theft of an

offender's property is a common occurrence, and incidents of theft often lead to violence between inmates. See id. In their experience, issuing padlocks is a reasonable means of controlling theft and reducing violent confrontations among offenders. See id. While both Secretary LeBlanc and Warden Goodwin are aware that offenders on occasion may use padlocks as weapons to assault other offenders, in their experience, padlocks are used as weapons on a small number offender-on-offender assaults. See id. Warden Goodwin has reviewed DWCC records of offender-on-offender assaults where a padlock was used as a weapon back to 2009, and found that there were 11 incidents prior to the subject assault. See Record Document 34-5.

Leone filed his Complaint August15, 2016, and divided it into multiple claims. See Record Document 1. First, Leone claims an Eighth Amendment violation against State Defendants for failing to protect him from the attack by Hongo using padlocks issued by DWCC. Second, Leone contends that his write up for a rule violation related to the August 16, 2015, verbal altercation with Hongo, and his continued housing assignment in extended lockdown is retaliation for his failure to dismiss his Administrative Remedy Procedure (ARP) Complaint alleging that DWCC failed to protect him from Hongo's attack. Third, Leone makes a claim for inadequate medical care immediately after the assault, and while he has been in extended lock down. Fourth, that his continued stay in extended lock down constitutes an Eighth Amendment violation related to his conditions of confinement. Finally, Leone makes state law claims against the defendants for both intentional torts and negligence. See id.

State Defendants filed the instant Motion for Summary Judgment on September 18, 2017, asserting there are no issues of material fact and that they are entitled to a

judgment as a matter of law. <u>See</u> Record Document 34. Leone responded by filing a Memorandum in Opposition on October 4, 2017, claiming State Defendants have not shown the absence of any genuine issues of material fact. <u>See</u> Record Document 40.

## LAW AND ANALYSIS

### I.     Legal Standards

#### A.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. This rule provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Also, "a party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment." Fed. R. Civ. P. 56(e)(3).

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings . . . [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal quotations and citations omitted). If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine dispute of material fact exists. <u>See id.</u> at 325; <u>see</u> <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).

A non-movant, however, cannot meet the burden of proving that a genuine dispute of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little, 37 F.3d at 1075. Additionally, in deciding a summary judgment motion, courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts." Id. Courts "do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Id.

The Court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). A court may grant summary judgment under Fed. R. Civ. P. 56(f)(3) so long as it provides the parties with "ample notice [and] time to respond" and "consider[s] everything" that the parties claim to be probative of the matters that have been identified. Santana v. Cook Co. Bd. of Review, 679 F.3d 614, 619 (7th Cir. 2012); see also Wang v. Prudential Ins. Co. of Am., 439 Fed. Appx. 359, 363 n.2 (5th Cir. 2011).

Pursuant to Local Rule 56.1, the moving party shall file a short and concise statement of the material facts as to which it contends there is no genuine issue to be tried. Local Rule 56.2 requires that a party opposing the motion for summary judgment set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be

served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule."[1] Local Rule 56.2.

### B. Section 1983 Suits: Individual Capacity vs. Official Capacity Claims

Section 1983 authorizes the assertion of a claim for relief against a person who, acting under the color of state law, allegedly violated the claimant's rights under federal law. See 42 U.S.C. § 1983. In § 1983 suits, government officials may be sued in either their individual or official capacities. A claim against a state or municipal official in his official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Individual or personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." Id.

### C. Qualified Immunity in Section 1983 Suits

The qualified immunity doctrine often protects public officials from liability in § 1983 actions brought against a person acting under the color of state law in his individual capacity. "The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation." Ashcroft v. Iqbal, 556 U.S. 662, 685 (2009) (internal quotations and citations omitted). In fact, a qualified immunity defense is truly "an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

---

[1] The Court notes that Leone failed to follow Local Rule 56.2. Leone submitted one paragraph where he suggests eleven of the State Defendants' seventy-three statements of fact are simply disputed. See Sheppard v. Nexion Health at Vivian, Inc., 2013 WL 636718, at *5 n. 55 (W.D. La. 2013)(holding plaintiff did not follow Local Rule 56.2 where "[p]laintiff submitted a numbered list of Defendant's uncontested material facts and only replied with either 'contested' or 'uncontested'"). Therefore, all of State Defendants' statement of material facts are deemed admitted.

Once the defendant raises a qualified immunity defense, the plaintiff carries the burden of demonstrating the inapplicability of qualified immunity. See Floyd v. City of Kenner, 351 Fed. Appx. 890, 893 (5th Cir. 2009). First, the court must determine whether the plaintiff demonstrated a genuine dispute of material fact as to a violation of a constitutional right. See Pearson, 555 U.S. at 232. Second, the court must determine whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. Id. A defendant who can validly raise a qualified immunity defense will enjoy its protection so long as the allegedly violated constitutional right was not clearly established at the time of the violation. See id. In other words, the defendant can only be held liable if he violates a right that is clearly established at the time of the violation.

## II. Analysis

### i. Sovereign Immunity

Leone sued the State Defendants in both their official and individual capacities. See Record Document 1. State Defendants assert they are entitled to sovereign immunity pursuant to the Eleventh Amendment of the United States Constitution concerning any official capacity claims. See Record Document 34-1 at 26.

The Eleventh Amendment states,

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

See Warnock v. Pesos County, Tex., 88 F.3d 341, 343 (5th Cir. 1996)("Eleventh Amendment sovereign immunity deprives a federal court of jurisdiction to hear a suit

against a state"). Congress has the power to abrogate Eleventh Amendment immunity, but the section of the Civil Rights Act of 1871 which creates a cause of action for deprivation of civil rights under color of law (42 U.S.C. § 1983) did not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 338, 99 S.Ct. 1139 (1979). Sovereign immunity can also be waived by the state; however (despite Leone's argument), Louisiana has not waived its Eleventh Amendment immunity from federal court jurisdiction.[2] See La. R.S. 13:5106(A); Champagne v. Jefferson Parish Sheriff's Office, 188 F.3d 312, 314 (5th Cir. 1999).

The LDPSC enjoys sovereign immunity under the Eleventh Amendment[3] and the Fifth Circuit has already held that section 1983 actions against the LDPSC are barred. See Champagne, 188 F.3d at 314. Leone concedes the LDPSC is not a "person" under 42 U.S.C. § 1983, and therefore cannot be liable thereunder. See Record Document 40 at 9. Therefore, LDSPC's motion is **GRANTED** and Leone's claims against said defendant are **DISMISSED WITHOUT PREJUDICE**.

The Eleventh Amendment immunity bar also extends to state officials when they are sued in their official capacities for retrospective money relief. See Strong v. Grambling State Univ., 159 F.Supp.3d 697, 706 (W.D. La 2015). On the other hand, the Eleventh Amendment does not bar monetary relief for past harms when the state official is sued in

---

[2] Leone contends Louisiana has waived its sovereign immunity, relying on La. R.S. 13:5106(B) which states, "Neither the state, a state agency, nor political subdivision shall be immune for suit and liability in contract or for injury to person or property." However, Leone completely ignores sub-part A of the same statute which reads, "No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court." La. R.S. 13:5106(A). The abrogation of sovereign immunity does not extend to federal courts.
[3] "A state's Eleventh Amendment immunity extends to any state agency or entity deemed an alter ego or arm of the state." Perez v. Region 20 Educ. Serv. Ctr., 307 F.3d 318, 326 (5th Cir. 2002); see also Champagne, 188 F.3d at 314 (suggesting that all Louisiana executive departments have Eleventh Amendment immunity).

his individual capacity. See Henley v. Simpson, 527 F.Appx. 303, 305 (5th Cir. 2013). Leone has asserted his section 1983 claims against Secretary LeBlanc, Warden Goodwin, and the other LDPSC employees in both their official and individual capacities, but only seeks monetary relief. See Record Document 1. Accordingly, Leone is barred from asserting claims against said defendants in their official capacities, but may pursue his section 1983 claims against said defendants in their individual capacities. Secretary LeBlanc, Warden Goodwin, and the LDPSC employees' motion is **GRANTED** and Leone's claims against said defendants in their official capacities are **DISMISSED WITHOUT PREJUDICE**.

### ii. Protection from Offender Violence

Leone's primary claims against the State Defendants allege said defendants failed to protect him from Hongo's attack with padlocks on August 17, 2015, and the failure to do so violated Leone's Eighth Amendment rights against cruel and unusual punishment. See Record Document 40 at 11. Defendants maintain Secretary LeBlanc and Warden Goodwin did not violate Leone's Eighth Amendment rights by maintaining a policy or practice of issuing padlocks to prisoners to secure their belongings. See Record Document 34-1 at 34. Additionally, Defendants argue the LDPSC employees were not deliberately indifferent to a known, serious risk of imminent assault on Leone. See id. at 42.

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. There are three elements to establish liability through a section 1983 action. Bush v. Viterna, 795 F .2d 1203, 1209 (5th Cir.1986). There must be (1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor. See id. "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." Baker v. McCollan, 443 U.S. 137, 146, 99 S.Ct. 2689 (1979); see also Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 450 (5th Cir. 1994).

Leone faults State Defendants for failing to protect him from the attack that occurred on August 17, 2015. The law in this area is well settled. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Adames v. Perez, 331 F.3d 508, 512 (5th Cir. 2003), citing Cantu v. Jones, 293 F.3d 839, 844 (5th Cir. 2002). Jail "officials have a [constitutional] duty ... to protect inmates from violence at the hands of other prisoners." Horton v. Cockrell, 70 F.3d 397, 400 (5th Cir. 1995); see also Johnston v. Lucas, 786 F.2d 1254, 1258 (5th Cir. 1986). "Prison officials are not, however, expected to prevent all inmate-on-inmate violence." Adames, 331 F.3d at 512. Prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm. See id.

To establish a § 1983 failure to protect claim plaintiff must show that he was detained or incarcerated "... under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection." Neals v.

Norwood, 59 F.3d 530, 533 (5th Cir. 1995). This is a subjective standard. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994). In other words, the prison official must have a sufficiently culpable state of mind, which, in prison-conditions cases, is one of "deliberate indifference" to inmate health or safety. See id. at 834. "To find that an official is deliberately indifferent, it must be proven that 'the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Cantu v. Jones, 293 F.3d 839, 844 (5th Cir. 2002), quoting Farmer, 511 U.S. at 837. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997), citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976). "Subjective recklessness," as used in the criminal law, is the appropriate test for deliberate indifference. Norton, 122 F.3d at 291, citing Farmer, 511 at 838–40.

Officials are not subject to liability under § 1983 for acts or omissions of their subordinates on the basis of respondeat superior. Mouille v. City of Live Oak, 977 F .2d 924, 929 (5th Cir. 1992). "A sheriff not personally involved in the acts that deprived the plaintiff of his constitutional rights is liable under section 1983 if: 1) the sheriff failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3)

the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." Thompson v. Upshur County, Tx., 245 F.3d 447, 459 (5th Cir. 2001). More specifically, Leone must show that he was incarcerated under conditions posing a "substantial risk of serious harm" and the defendants acted with deliberate indifference to that danger. See Farmer, 511 U.S. 825 at 834.

### a. Secretary LeBlanc and Warden Goodwin's Policy of Issuing Padlocks

Leone's complaint asserts the padlocks distributed to offenders at DWCC to secure their personal belongings can be used as dangerous weapons thereby putting other offenders at risk of being attacked with the padlocks, and that corrections officials had prior knowledge that padlocks could be used in this manner. See Record Document 40 at 12. In effect, Leone's position is that prior padlock assaults were sufficient to put defendants "on notice" that such padlocks were being utilized as weapons and thus posed a "substantial risk of serious harm," to which they responded with "deliberate indifference." Farmer, 511 U.S. 825 at 834.

This Court has rejected prior claims that a corrections policy of issuing padlocks to inmates to secure their belongings, where officials were aware that padlocks were sometimes used as weapons, constituted deliberate indifference. See Francisco v. Hebert, 2007 WL 1805772, at *7 (W.D. La. 2007); Barron v. Ouachita Par. Sheriff's Office, 2007 U.S. Dist. LEXIS 74739 (W.D. La. 2007), report of the magistrate adopted, 2007 U.S. Dist. LEXIS 70636 (W.D. La. 2007). In Francisco, an offender was beaten by another offender with a padlock while in custody at the Iberia Parish Jail. See Francisco, 2007 WL at *1. The plaintiff brought a failure to protect claim against the sheriff, alleging that one

prior offender-on-offender attack "put the sheriff 'on notice' that such padlocks were being utilized as weapons, and thus posed a 'substantial risk of serious harm', to which he responded with 'deliberate indifference.'" Id. at *5, quoting Farmer, 511 U.S. 825 at 834. The court found the prison's policy of issuing padlocks to offenders did not amount to deliberate indifference where the plaintiff failed to demonstrate that offenders' possession of padlocks created a pervasive or substantial risk of harm. See id. at *7. The court also recognized the plaintiff's argument "fail[ed] to consider that the padlock 'weapon' at issue is not simply a weapon, but serves the primary and necessary function of securing inmates' private property." Id.

Leone contends previous offender attacks using padlocks as weapons at DWCC distinguishes his case from the plaintiff's in Francisco, and should be sufficient to put Secretary LeBlanc and Warden Goodwin on notice that padlocks do pose a substantial risk of harm. See Record Document 40 at 13-14. From 2009 through July 2015, there were eleven offender-on-offender padlock assaults: twice in 2009, three times in 2010, twice in 2011, once each in 2012 and 2013, none in 2014, and two in 2015 (before Hongo's attack on Leone). See Record Document 34-5. While there is more evidence of padlock assaults, the evidence does not create a condition posing a substantial risk of serious harm.

Although there is no Fifth Circuit authority determining the number of padlock attacks sufficient to constitute a "pervasive" or "substantial risk of harm," the First Circuit has addressed this exact question. See Lakin v. Barnhart, 758 F.3d 66 (1st Cir. 2014). In Lakin, from 2007 through 2012, there was an average of two padlock assaults per year, with a high of six assaults in 2010. See id. at 68. The court did not consider this number

sufficient, stating, "[W]e cannot say that a small number of assaults involving the use of a particular prison-issued item, without more, is sufficient to sustain the conclusion that providing the item without restriction created 'conditions posing a substantial risk of serious harm' rising to the level of constitutional violation."[4] Id. at 70, quoting Farmer, 511 U.S. at 534.

Here, the number of padlock assaults is even lower than the number in Lakin. Eleven offender-on-offender padlock assaults recorded over the seven year period at DWCC comes out to an average of 1.57 assaults per year. If the Lakin court found an average of two padlock assaults per year a "small number" insufficient to create a "substantial risk of serious harm," than surely a lesser average of 1.57 assaults per year cannot create a substantial risk of serious harm required under Farmer.

Additionally, Secretary LeBlanc and Warden Goodwin's decision to distribute padlocks is given great discretion by courts of law. The Supreme Court has stated, "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct 2254, 2261 (1978). In adopting the "reasonable relation" test, the Court emphasized the need for courts to defer to the judgment of corrections officials. See id. This deference is illustrated in Florence v. Bd. Of Chosen Freeholders, 566 U.S. 318, 132 S.Ct. 1510 (2012). There, the Court was asked to consider whether a detention center's policy requiring the strip-searching of all incoming prisoners violated arrestee's rights under the Fourth Amendment. See id. at 324-25. The Court noted the difficulties of

---

[4] The First Circuit did note there is no "freestanding, numerical threshold" where offender-on-offender assaults might make it necessary for it risk to be considered "substantial" under Farmer. See id. at 71.

operating a detention center and stated, "Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." Id. at 326.

Warden Goodwin has been Warden of DWCC since 2008, having begun his correctional career in 1984. See Record Document 34-4. He has held rank and position at every level of corrections at DWCC. See id. Secretary LeBlanc has been Secretary of LDPSC since 2008, having begun his corrections career in 1995. See Record Document 34-5. He is a member of the American Correctional Association, vice president of the Department of Public Safety and Corrections Credit Union, and serves as secretary of the Louisiana Association of Wardens and Superintendents. See id. Both Warden Goodwin and Secretary LeBlanc cite the long-standing practice of having offenders secure their personal belongings in lockers with padlocks, as having a penalogical basis. See Record Document 34-5 and Record Document 34-4. Theft of personal property among offenders is a common problem in correctional centers and frequently results in hostility, confrontation, and violence. Having offenders lock away their personal belongings tends to reduce the incidence of theft. Both Warden Goodwin and Secretary LeBlanc acknowledge issuing padlocks and storage boxes is a common and widely accepted method for accomplishing this goal in both state and federal corrections centers, noting that padlocks are available for sale in numerous corrections centers in Texas and Mississippi. See id. The justifications and utility of padlocks is contrasted by the relatively low risk of offender-on-offender padlock assaults.

In his opposition, Leone concedes the need to secure offender possessions is a legitimate concern, but argues this need does not outweigh the need for offender safety.

18

<u>See</u> Record Document 40 at 14. Without submitting any evidence in support, Leone argues there are a variety of other locks safer than padlocks that can be used to secure the property of offenders. <u>See id</u>. Leone concludes that by not choosing an alternative, "safer" method to secure offenders' possessions, Warden Goodwin and Secretary LeBlanc have shown deliberate indifference. <u>See id</u>.  Leone does not cite any legal authority to support his argument and fails to address any of the cases which directly contradict his opinion.

Leone has failed to demonstrate that offenders' possession of padlocks at DWCC created or pervasive or substantial risk of harm. Further, Secretary LeBlanc and Warden Goodwin's decision to distribute padlocks to offenders is given great deference since the regulation is reasonably related to a legitimate penalogical interest. For these reasons, Leone's claims against Secretary LeBlanc and Warden Goodwin are **DISMISSED**.

### b. LDPSC Defendants were not Deliberately Indifferent

While corrections officials have a duty to take reasonable measures to protect the safety of offenders, not every injury an offender suffers at the hands of another offender gives rise to a claim under the Eighth Amendment. <u>See</u> <u>Farmer</u>, 511 U.S. at 832-34. "[P]rison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious ham." <u>Adames</u>, 331 F.3d at 512. "Deliberate indifference" means that the official "knows of and disregards an excessive risk to inmate health of safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837. In this case, there is no evidence

whatsoever that could have led corrections officials to conclude that Leone was at risk of an attack by Hongo.

The verbal dispute between Leone and Hongo surrounding the fan in the dormitory occurred the day before the assault at issue, and was not witnessed by any corrections officers. Leone and Hongo worked together and spoke nearly every day. <u>See</u> Record Document 34-11 at 11-12. In fact, Hongo called Leone his "home boy." <u>See</u> Record Document 8 at 2. The verbal dispute regarding the fan was the first incident between Leone and Hongo. <u>See</u> Record Document 34-11 at 11-12. When asked why he did not report the fan incident and Hongo's "threat" to security, Leone stated he did not feel threatened and was completely surprised when Hongo attacked him the next day. <u>See id</u>. at 16-17. The corrections officers at DWCC were clearly not aware of the verbal dispute until the investigation following the assault. There is simply no evidence in the summary judgment record to rebut the assertion that corrections officials were unaware of any serious risk to Leone being assaulted by Hongo.

Leone concedes the corrections officials were never made aware of the specific threat Hongo posed to him, but cites <u>Jones v. Diamond</u>, 636 F.2d 1364, 1373 (5th Cir. 1981), overruled on other grounds by <u>Int'l Woodworkers of Am. v. Champion Int'l Corp.</u>, 790 F.2d 1174 (5th Cir. 1986), suggesting that a specific threat is unnecessary in a prison environment "where terror reigns." <u>See</u> Record Document 40 at 12. However, Leone presents no summary judgment evidence that the conditions at DWCC were in any way like the conditions at Jackson County Jail in <u>Jones</u>. There, the Fifth Circuit found:

> Prisoner abuse by other prisoners was common. During the Diamond administration, prison management was in effect turned over to trusties fifteen to sixteen hours a day. Deputies were on duty downstairs but, apart

from occasional patrols, they had no knowledge of events in the jail and could not be summoned by prisoners. The evidence satisfies us that there was constant violence, and, at least during part of the period, a prisoner-run kangaroo court that inflicted physical and sexual abuse on other prisoners.

Jones, 636 F.2d at 1373. There is simply no evidence of any sort regarding the conditions at DWCC that is somewhat similar in any respect to the conditions of the jail in Jones that would suggest DWCC is a prison where terror reigns. Since there is no evidence that any corrections officials were actually aware of the threat Hongo posed to Leone, there can be no genuine dispute that any LDPSC employee acted with deliberate indifference in failing to protect Leone from his attack. Accordingly, Leone's claims against the other LDPSC employees is **DISMISSED**.

### iii. Retaliation

Leone alleges his placement in protective custody was retaliation for filing a grievance stating that the State Defendants failed to protect him from the attack by Hongo. See Record Document 40 at 15. Leone submits his First, Eighth, and Fourteenth Amendment rights were violated by the State Defendants' deliberate conduct. See id. at 16. The State Defendants argue Leone has failed to show the existence of any retaliatory motive, causation, or actual prejudice. See Record Document 34-1 at 54.

The law in the Fifth Circuit in this area is clear:

[It] is well established that prison officials may not retaliate against an inmate who exercises his right of access to court. Officials likewise may not retaliate against an inmate for using the grievance system. A plaintiff must allege facts showing that the defendant possessed a retaliatory motive. The inmate must show more than his personal belief that he was the victim of retaliation. Mere conclusory allegations of retaliation are not enough.

Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999); Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988).

In order to establish a claim for retaliation, the offender must establish each of the following elements:

1) The invocation of a specific constitutional right;
2) The defendants' intent to retaliate against the plaintiff for his or her exercise of that right
3) A retaliatory adverse act; and
4) Causation, i.e., but for the retaliatory motive the complained of incident would not have occurred.

Clarke v. Stalder, 121 F.3d 222, 231 (5th Cir. 1997), vacated in part and reinstated in relevant part, 154 F.3d 186 (5th Cir. 1998), citing Bounds v. Smith, 430 U.S. 817, 97 S. Ct. 1491 (1977).

Regarding Leone's claim that his First Amendment rights were violated, he has failed to show any actual injury. The Supreme Court has not extended a prisoner's right of access to the courts to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court. See Manning v. Sumlin, 540 Fed.Appx. 462, 463 (5th Cir. 2013). To state a claim that his constitutional right of access to the courts was violated, Leone must demonstrate that his position as a litigant was actually prejudiced. See Lewis v. Casey, 518 U.S. 343, 350-51, 116 S.Ct. 2174 (1996).

From the evidence presented, it is clear that Leone has submitted materials sufficient to present his administrative remedy procedure act ("ARP"), and to prosecute this civil case. Likewise, it is clear that Leone has suffered no actual legal prejudice. Leone does not address his First Amendment retaliation claim in his opposition brief. Thus, Leone has failed to show the existence of retaliatory motive, causation, or actual prejudice to his position as a litigant. Accordingly, Leone's First Amendment retaliation claim is **DISMISSED**.

Leone argues his initial and continuing placement in protective custody was retaliation for filing a grievance in violation of his Eighth Amendment rights. <u>See</u> Record Document 40 at 15. Leone alleges that shortly after filing his ARP, Warden Goodwin and Evans met with him and demanded that he drop his grievance. <u>See</u> Record Document 1 at 9. When Leone refused, he was ordered to sign a Protective Custody Request from, and threatened with a write-up for aggravated disobedience if he failed to do so. <u>See id</u>. However, Leone's statements regarding his placement in protective custody have been inconsistent[5] and Leone is unable to prove any retaliatory intent.

On October 27, 2015, Leone filed his first request for administrative relief alleging that DWCC failed to protect him from Hongo's attack. <u>See id</u>. at 7. While this request was pending, Leone filled out a request for protective custody on December 7, 2015, stating his reasons as:

> I have been assaulted by offender Ronnie Hongo. Due to failure to protect me in that case. Due to my ARP I am suppose to be in Protection. So I am going to be sent to the blocks.

Record Document 40-6 at 1. Warden Goodwin and Evans interviewed Leone concerning this request, and noted the following information for the disciplinary board's consideration:

> Leone … indicated he is still being housed in the same environment and custody. States that he was in prior to being assaulted on Aug. 17, 2015 by another offender. Leone further stated that he is following the advice of his attorney in this matter. He stated that he really didn't need protection but he has to do what his attorney tells him.

---

[5] On December 7, 2015, Leone completed his request to be placed in protective custody. In writing his own reasons, Leone stated, "I have been assaulted by the offender Ronnie Hongo. Due to failure to protect me in that case…Due to my ARP I am suppose to be in protection. So I am going to be sent to the Blocks." Record Document 34-10 at 2. In a later ARP, Leone suggests he was forced to sign the protective custody request, writing, "After being 'forced' to sign a PC form, I was locked up." Record Document 40-7. In his deposition, when asked about the request, he admits that he freely filled out the reasons he wanted to be in protective custody, but wanted the writing to be in a "smart ass" or sarcastic" way. <u>See</u> Record Document 34-12 at 6.

Record Document 34-10 at 2. Leone's request to be moved to protective custody was approved on December 9, 2015. See id.

Two months later, Leone filed a second request for administrative relief in which he claims he was forced to sign the request for protective custody by Warden Goodwin and placed in protective custody as retaliation for filing his earlier request for administrative relief. See Record Document 40-7 at 1. Deputy Warden Rachal ("Rachal") made the first step response and noted that Leone's claims of being threatened by Warden Goodwin were denied by Evans. See id. at 4. Rachal further gave the staff's reasons for placing Leone in protective custody:

> As you (Leone) had previously been involved in a dispute with another offender that you failed to notify staff of, which resulted in you being assaulted, administrative staff determined it prudent to place you in protective custody for your concerns.

See id. In his opposition brief, Leone offers the conclusory allegation that "there is no rational bases other than retaliation" for continuing protective custody. See Record Document 40 at 17. However, Rachal's statement provides such rationale. Therefore, Leone's Eighth Amendment retaliation claims are **DISMISSED**.

Regarding Leone's claim that his placement in protective custody violated his Fourteenth Amendment rights, where the decision to keep an inmate is "reasonably related to legitimate security objectives and is not an exaggerated response to security considerations, there is no denial of due process." McCord v. Maggio, 910 F.2d 1248, 1251 (5th Cir. 1990). As discussed above, corrections officials kept Leone in protective custody based on Leone's own concerns for his safety. DWCC maintains a policy where an offender placed in protective custody receives a review by the Board every thirty days.

See Record Document 34-7 at 6. From December 9, 2015, until the middle of April 2017, Leone never made a request for classification change. See id. at 7. Thus, the decision is considered reasonably related to a legitimate security objective and Leone has failed to produce any sufficient evidence to show this decision was an "exaggerated response."

Corrections officials were reasonable in their belief that protective custody was appropriate for Leone based on his safety concerns. Leone initiated the request to be placed in protective custody. Once in protective custody, corrections officials were reasonable in keeping Leone in solitary confinement. Therefore, Leone has failed to show there is any genuine dispute that he was placed and kept in protective custody without due process as retaliation for filing his initial request for administrative relief. Therefore, Leone's Fourteenth Amendment retaliation claims are **DISMISSED**.

### iv. Conditions of Confinement

In addition to his placement in protective custody,[6] Leone contends that limitations to visitation, telephone calls, access to showers and hygiene, and threats made by State Defendants also violate his Eighth Amendment rights. See Record Document 1 at 14-15. Leone's allegations, however, do not rise to the level of an Eighth Amendment violation.

For conditions of confinement to rise to the level of an Eighth Amendment violation, they must be "cruel and unusual" under contemporary standards. Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981). To the extent that such conditions are restrictive

---

[6] In his Complaint, Leone asserted a condition of confinement claim for his placement in protective custody. See Record Document 1 at 14. Regarding this claim, Leone argues "State Defendants can show no rational bases, other than retaliation…for placing Leone in solitary confinement." Record Document 40 at 17. For this reason, the Court interprets Leone's argument as a continuation of his retaliation claims and has addressed his argument accordingly.

and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. See id. However, when the restrictions of confinement rise to a level that results in physical torture, it can result in pain without penalogical purpose constituting cruel and unusual punishment under the Eighth Amendment. See Bradley v. Puckett, 157 F.3d 1022, 1025 (5th Cir. 1998). To rise to the level of a constitutional violation, the conditions must be "'so serious as to deprive [plaintiff] of the minimal measure of life's necessities ….'" Alexander v. Tippah County, 351 F.3d 626, 630 (5th Cir. 2003) quoting Woods v. Edwards, 51 F.3d 577, 581 (5th Cir.1995). Thus, in order to prevail on such a claim, the plaintiff must demonstrate not only that he was exposed to a substantial risk of serious harm, but that he actually suffered some harm that was more than de minimis. Alexander, 351 F.3d at 630-631.

Leone has alleged injury in purely conclusory manner, failing to introduce any evidence in support of his claims. However, taking the facts alleged as true, Leone establishes no more than discomfort and inconvenience. For example, Leone does not complain about the lack of showers, but rather that he must be placed in handcuffs and escorted to and from the shower. Leone alleges the mechanical restraints caused physical pain and harm and that he is forced to pay to renew his "duty status" to avoid suffering such pain. See Record Document 40 at 18. Leone pays $3.00 for said duty status. See Record Document 40-4. Leone does not cite to any legal authority to support his argument that this harm is any more than de minimis. Even if this harm was considered more than de minimis, Leone has not shown the State Defendants were deliberately indifferent. Leone fails to address his claims regarding the limitations on visits and

telephone calls. From the facts alleged, Leone is unable to demonstrate any physical harm beyond de minimis inconvenience.

Leone also alleges that State Defendants have verbally threatened him and called him derogatory names. <u>See</u> Record Document 1 at 16. However, the Fifth Circuit has held that verbal threats, harassment, and name calling do not constitute a constitutional violation. <u>See</u> <u>Siglar v. Hightower</u>, 112 F.3d 191, 193 (5th Cir. 1997)("It is clear that verbal abuse … does not give rise to a cause of action under § 1983"); <u>see also</u> <u>Bender v. Brumley</u>, 1 F.3d 271, 274 n.4 (5th Cir. 1993)(holding that claims of verbal abuse and harassment are not actionable under § 1983).  Leone's allegations fail to give rise to the level of an Eighth Amendment violation; therefore, his conditions of confinement claims are **DISMISSED**.

### v. Inadequate Medical Care

Leone alleges both the medical response to his injuries immediately after Hongo's attack, and his access to medical care and medications upon his return to DWCC were inadequate. <u>See</u> Record Document 1 at 12-14. State Defendants argue Leone has failed to exhaust his administrative remedies as to these claims, and, alternatively, Leone cannot show State Defendants acted with deliberate indifference. <u>See</u> Record Document 34-1 at 60-61.

The Prison Litigation Reform Act ("PLRA"), § 1997e(a), declares: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Exhaustion is mandatory for "all inmate suits about prison life, whether they involve general circumstances or

particular episodes, and whether they allege excessive force or some other wrong."
<u>Alexander</u>, 351 F.3d at 629–30, <u>quoting</u> <u>Porter v. Nussle</u>, 534 U.S. 516, 532, 122 S.Ct.
983 (2002). Therefore, the PLRA applies to the section 1983 medical claims asserted by
Leone.

Leone filed two requests for administrative relief prior to this instant action. <u>See</u>
Record Document 1 at 6 and Record Document 40-7. The first request specifically cited
the failure to protect Leone at the time of the assault. <u>See</u> Record Document 1 at 6. The
second request addressed the issue of retaliation for filing the first request. <u>See</u> Record
Document 40-7. Leone does not address his claims for inadequate medical care
anywhere in either request; therefore, he failed to pursue the administrative remedies
available to him. The Court must dismiss Leone's claim pursuant to 42 U.S.C. § 1997(e).

### vi. Qualified Immunity

It is clear from the facts of this case, viewed in the light most favorable to Leone,
that the State Defendants' actions did not give rise to any issue of constitutional
magnitude. As such the Court further finds that State Defendants are entitled to qualified
immunity from suit. <u>See</u> <u>Francisco v. Hebert</u>, 2007 WL at *10, <u>citing</u> <u>Gibson v. Rich</u>, 44
F.3d 274, 277 (5th Cir. 1995) (holding government officials are entitled to qualified
immunity from suit when performing discretionary functions unless their conduct violated
statutory or constitutional rights, clearly established at the time of the alleged incident, of
which a reasonable person would have known).

### vii. Louisiana State Law Claims

Although 28 U.S.C. § 1367 confers supplemental jurisdiction over plaintiffs' state law claims, the assertion of supplemental jurisdiction may be declined if all claims over which the Court has original jurisdiction are dismissed. See 28 U.S.C. § 1367(3). "When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims. However, the dismissal of the pendent claims should expressly be without prejudice so that the plaintiff may re-file his claims in the appropriate state court." Bass v. Parkwood Hosp., 180 F.3d 234, 246 (5th Cir.1999). "The Supreme Court in United Mine Workers of America v. Gibbs, emphasized that '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law.'" Francisco, 2007 WL at *10, citing Noble v. White, 996 F.2d 797, 799 (5th Cir.1993).

Because the entirety of Leone's federal claims will be dismissed by this ruling, the Court will not have original jurisdiction over their remaining state law claims and declines to exercise its supplemental jurisdiction. Accordingly, the Court will dismiss plaintiffs' state law claims without prejudice.

### CONCLUSION

For the foregoing reasons, the State Defendants' Motion for Summary Judgment is **GRANTED**. State Defendants are entitled to sovereign immunity for "official capacity" claims and such claims by Leone are **DISMISSED WITHOUT PREJUDICE**. All of Leone's remaining federal law claims lack sufficient summary judgment evidence and are **DISMISSED WITH PREJUDICE**. Because all of Leone's federal claims have been

dismissed by this ruling, the Court declines to exercise supplemental jurisdiction over Leone's state law claims pursuant to 28 U.S.C. § 1367(3); therefore, Leone's state law claims are **DISMISSED WITHOUT PREJUDICE**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this the 18th day of December, 2017.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT